UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RACHAEL MARIE HAWLEY ,

               Plaintiff,                     Case No. 2:15-cv-12497
                                        District Judge Denise Page Hood
v.                                   Magistrate Judge Anthony P. Patti

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.
_____/

### RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 12) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 11)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.**    **REPORT**

       Plaintiff, Rachael Marie Hawley, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her applications for disability insurance

benefits and supplemental security income.  This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's motion for

summary judgment (DE 11), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 12), and the administrative record (DE 7).

### A.      Background

Plaintiff protectively filed her applications for benefits on August 6, 2012, alleging that she has been disabled since May 13, 2009.  (R. at 33.)  Plaintiff's applications were denied and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Earl Ashford held a hearing on March 25, 2014.  (R. at 54-89.)  He subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 33-48.)   On June 19, 2015, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.) ALJ Ashford's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.      Plaintiff's Medical History

The undersigned has thoroughly reviewed Plaintiff's extensive medical record.  In lieu of a lengthy summary of Plaintiff's medical history, I will make references and citations to the record as necessary in response to the parties' arguments.

### C.      Hearing Testimony

#### 1.      Plaintiff's Testimony

At the March 25, 2014 administrative hearing, Plaintiff testified that she lives with her fiancé, Joshua Engler, and her two sons, respectively aged eight years and nine months. (R. at 59.) She has a driver's license, but explained that she has problems seeing while driving at night. (R. at 60.)

Plaintiff's last brief job was in an unspecified position at the Wyandotte Hospital. According to Plaintiff, she was fired from that position due to her MRI results. (R. at 61.) Prior to that, she had a position at the Sky Ridge Medical Center, where she worked as a central sterile technician, which involved cleaning instruments for surgeries and putting them in an autoclave for sterilization. (R. at 60-61.) The trays of instruments could weigh up to 50 pounds. (R. at 62.)

Plaintiff testified that she can no longer work because of "pain problems." (R. at 62.) Specifically, she indicated that she has problems with her back and knee, as well as migraines, chronic illness, bipolar disorder, and borderline personality disorder. (Id.) Plaintiff explained that her back pain occurs in her lower back "around L4/L5." (R. at 64.) She had one back surgery in 2011, but testified that the pain worsened after the surgery. She was supposed to have a second surgery, but it did not happen because of the potential for dental infection. (R. at 69.) According to Plaintiff, her highest level of back pain is a ten out of ten and the lowest level is six or seven. (R. at 64-65.) She estimated that she has been to the emergency room on ten to twenty occasions in her life due to her back pain,

3

including three or four times in the last year.  (R. at 64-65.)  In addition, she twice visited the emergency room for migraine headaches.  (R. at 65.)

Plaintiff also testified to having trouble with sciatic pain.  (R. at 71.)  The pain starts in her lower back and radiates to her right leg and left posterior.  (Id.) She testified that the pain had gotten worse since her 2011 surgery.  (R. at 71.)

Plaintiff explained that she has a history of seizures, with the last occurring in 2010.  (R. at 75.)  In addition, she mentioned chronic bursitis in her right knee. (Id.)  She noted that she had nine surgeries and was missing "most of her internal organs."  (R. at 76.)  Plaintiff clarified that this included her gallbladder, her appendix, her tonsils, and part of her cervix.  (R. at 82.)  She was also recently diagnosed with fibromyalgia.  (R. at 77.)

Plaintiff indicated that her most serious physical condition is her back, but that her mental health is "more life threatening."  (R. at 72.)  She was hospitalized for a suicide attempt on May 12, 2009.  (Id.)  She also testified to cutting and burning herself before she had her son.  (R. at 73.)  She noted that she cries a couple of times a day and thinks of suicide biweekly.  (R. at 79.)  Plaintiff explained that being around more than two people makes her nervous and causes her to have chest pain and panic attacks.  (R. at 63 and 76.)   She deals with these feelings by staring at the ground, rocking, and bouncing her leg.  (R. at 63.)  She

takes several medications every day to deal with her mental conditions, and explained that the medicine makes her feel "dizzy" or "drunk."  (R. at 73.)

Plaintiff estimated that she could walk two city blocks before lying down, stand for ten to twenty minutes without holding on to something, and sit comfortably for five minutes "at most."  (R. at 65-67.)  She noted that a doctor had put her on a ten pound lifting restriction a year prior to the hearing.  (R. at 66.)

On an average night, Plaintiff claims that she gets two hours of solid sleep.  (R. at 67 and 70.)  Her fiancé is responsible for household chores, including grocery shopping, cooking, and cleaning. (R. at 67.)  Plaintiff sometimes helps with the dishes, but requires a break after about ten minutes.  (R. at 68.)  Her fiancé also helps to care for her baby, but she cares for her older son on her own.  During a typical day, Plaintiff spends most of her time lying in bed, unless she is taking care of her kids.  (Id.)

### 2.    Vocational Expert Testimony

Jacqueline Shabacker testified as the Vocational Expert ("VE") at the administrative hearing.  (R. at 82-89.)  The VE identified Plaintiff's past relevant work as a central service technician, a cashier in a restaurant, a paper deliverer, and a sales clerk.  (R. at 83.) The ALJ then presented a series of hypotheticals to the VE.  In the first of these, the ALJ asked the VE to determine if a hypothetical individual of Plaintiff's age, education, and work experience could perform

Plaintiff's past relevant work at the light exertional level with the following

limitations:

> [T]he hypothetical individual must be allowed to stand or sit alternatively at will provided that they're not off task for more than 10% of the work period.
>
> Postural limitations of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; occasional use of the bilateral lower extremities for operation of foot controls.
>
> The manipulative limitation of frequent use of the bilateral upper extremities for handling and fingering and environmental limitation to avoid all exposure to hazards such as moving machinery and unprotected heights and an additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dusts, gases, extreme cold, extreme heat, humidity, and wetness.
>
> Work should be limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts involving only work-related decisions with few, if any workplace changes; and there should be occasional interaction with the general public, coworkers, and supervisors.

(R. at 84-85.)  The VE testified that the individual could not perform Plaintiff's

past relevant work, but would be capable of performing other light work in the

national economy: an inspection position, with 2,000 jobs in the local economy[1]

and 80,000 nationally; sorter, with 2,000 jobs in the local economy and 80,000

---

[1] The VE described the local economy as northwest Ohio and southern Michigan. (R. at 85.)

nationally; and bench assembler, with 1,000 jobs in the local economy and 60,000 nationally.  (R. at 85-86.)

In his second hypothetical, the ALJ asked the VE to carry forward the prior limitations but reduce the exertional level from light to sedentary.  The VE testified that the hypothetical individual would be capable of performing the following work at the sedentary level: an inspection position, with 1,000 jobs in the local economy and 50,000 nationally; sorter, with 1,000 jobs in the local economy and 50,000 nationally; and bench assembler, with 500 jobs in the local economy and 25,000 nationally.  (R. at 86.)

In the third hypothetical, the ALJ asked the VE to stay at the sedentary exertional level and assume that the individual would need to sit or stand alternatively at will, provided they are off-task for under 10% of the workday with the following limitations:

> [P]ostural limitations of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; no crawling, occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of occasional use of the bilateral upper extremities for reaching, handling, and fingering; and environmental limitation to avoid concentrated exposure to hazards such as moving machinery, unprotected heights, irritants such as fumes, odors, dusts, gases, extreme cold, extreme heat, humidity, and wetness; would be limited to office noise levels; would be limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving machinery—moving assembly lines and conveyor belts involving only work-related

decision with few, if any, workplace changes; and occasional interaction with the general public, coworkers, and supervisors.

(R. at 86-87.)  The VE testified that those limitations would preclude competitive employment.  Finally, the VE testified that being off task more than ten percent of the time would be work preclusive, as would more than one absence per month.  (R. at 87-88.)

## D.  THE ADMINISTRATIVE DECISION

On April 18, 2014, the ALJ issued his decision.  (R. at 33-48.)  At Step 1 of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the  review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

substantially gainful activity since January 5, 2011.  (R. at 36.) [3]

At Step 2, the ALJ found that Plaintiff had the following severe impairments: status-post back surgery with back pain, history of seizure disorder and/or syncope, status post-carpal tunnel release surgery, fibromyalgia and/or chronic pain disorder, migraines, arthritis, chronic respiratory illness, generalized anxiety disorder, bipolar disorder, and borderline personality disorder.  (R. at 36.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 1.04, 11.02, 11.03, 11.00, 12.00, 12.04, 12.06, or 12.08.  (R. at 37.)

Between Steps 3 and 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff had the capacity to perform light work, with the ability to stand or sit alternatively at

---

[3] Although Plaintiff's alleged onset date was initially listed as August 2, 2008, she was found to be not disabled in a prior decision on January 4, 2011.  (R. at 33.) Plaintiff did not challenge the earlier decision.  The ALJ concluded that Plaintiff had not provided good cause to reopen the prior application, and accordingly amended the alleged onset date to the date of the last opinion.  The ALJ further determined that Plaintiff had shown a changed circumstance material to the determination of her disability, and therefore did not adopt the RFC opined by the prior ALJ.

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

will, provided she was not off-task for more than ten percent of the work period.

In addition, she was limited to:

> No climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling, occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of frequent use of the bilateral upper extremities for handling and fingering; an environmental limitation to avoid all exposure to hazards, such as moving machinery and unprotected heights; an additional environmental limitation to avoid concentrated exposure to irritants, such as fumes, odors, dust, gases, extreme cold, extreme heat, humidity, and wetness; work limited to simple, routine and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions with few, if any, workplace changes; and occasional interaction with the general public, co-workers, and supervisors.

(R. at 39.)

The ALJ determined at Step 4 that Plaintiff was unable to perform her past relevant work.  (R. at 45.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 46.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that

11

would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.  ANALYSIS

Plaintiff asserts seven statements of error, but these arguments are more effectively grouped into three overarching issues: 1) that the ALJ improperly discounted her credibility; 2) that the ALJ's analysis of her back injury was lacking; and 3) that the RFC is not supported by substantial evidence. The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions.  I will address each of these broad issues and the sub-issues raised within them in turn.

### 1.    Credibility

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also*

*Beavers v. Sec'y of Health, Ed., & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.").  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 475.

Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").  When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011).  The ALJ made this finding here, concluding that

Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (R. at 40.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence."   20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p.  A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions.  *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight."  *Malcolm v. Comm'r of Soc. Sec.*, No.

14

13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *1 (July 2, 1997)).

### a.    Failure to Follow Treatment Recommendations

Plaintiff asserts that the ALJ's analysis did not comply with SSR 96-7p because he did not consider the reasons for her failure to follow prescribed treatment.  Specifically, the ALJ pointed out Plaintiff's non-compliance with treatment recommendations after her March 2011 back surgery, her failure to attend therapy and refusal to keep a journal as directed, and a July 2012 mental health progress note indicating that she had no desire to change.  (R. at 45.)  The ALJ further explained that, although he had "considered the possibility that the claimant was unable to afford treatment," the record demonstrates that Plaintiff continued to smoke a pack of cigarettes per day and was able to travel to Tennessee after her surgery.  Accordingly, the ALJ determined that Plaintiff's failure to comply with treatment was not due to a lack of resources, but instead an "unwillingness to do what is necessary to improve her condition and an indication that her symptoms are not as severe as she purports."  (Id.)

Plaintiff contends that in reaching such a conclusion, the ALJ failed to consider her reasons for not complying with treatment recommendations; however, Defendant counters that the ALJ explicitly considered Plaintiff's ability to afford treatment when assessing her credibility.  Defendant also asserts that the ALJ's

consideration of Plaintiff's ability to afford cigarettes and travel a matter of record not in error.

An ALJ may consider a claimant's failure to comply with treatment as a sufficient reason to discount credibility. *Sias v. Sec'y of Health & Hum. Servs.,* 861 F.2d 475, 480 (6th Cir.1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); S.S.R. 96–7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").  Pursuant to Social Security Ruling 96-7P, however, an ALJ may not draw:

> any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

S.S.R. 96-7P.  For example, the ALJ should consider the claimant's explanation where the individual "may be unable to afford treatment and may not have access to free or low-cost medical services."  *Id.*  Similarly, Social Security Ruling 82-59 provides that inability to afford treatment is a justifiable cause for failing to follow prescribed treatment.  S.S.R. 82-59; *see also McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) (agreeing with the conclusion that a "condition that is disabling

in fact continues to be disabling in law," when the claimant "cannot afford prescribed treatment or medicine and can find no way to obtain it." (internal quotations omitted)).

Plaintiff relies on several cases from outside this district to support her contention. For example, she points to *Crowther v. Comm'r of Soc. Sec.*, No. 1:11-cv-394, 2012 WL 2711041 (S.D. Ohio July 6, 2012) *report and recommendation adopted*, No. 1:11-cv-394, 2012 WL 3113324 (S.D. Ohio July 31, 2012), for the proposition that a claimant's non-compliance with recommendations "is not, *standing alone*, a sufficient basis for discounting plaintiff's credibility." *Id*. at *18 (emphasis added). Here, the ALJ did not rely on Plaintiff's noncompliance as a stand-alone reason to discount her credibility. He also pointed to unremarkable test results and fairly extensive reported activities of daily living that contradict a finding of total disability, including: helping to coach her son's baseball team, performing pool exercises four to five times per week, out-of-state travel, twice participating in a "walk away" video, shopping, and being the sole caregiver for her older son, while sharing responsibilities for taking care of her infant. (R. at 41-45.)

Plaintiff also relies on *Diego v. Colvin*, 31 F. Supp. 3d 1183 (E.D. Wash. 2014), where the court found that the ALJ *failed to consider alternative explanations for lack of compliance* because he "did not ask Plaintiff for an

17

explanation for his apparent failure to follow the treatment recommendations." *Id.* at 1190. Here, however, the ALJ explicitly considered alternative explanations for Plaintiff's lack of compliance, making the *Diego* holding distinguishable. (R. at 45.)

In sum, despite Plaintiff's protestations to the contrary, the ALJ explicitly considered her potential economic reasons for failing to comply with treatment in compliance with S.S.R. 96-7p. (R. at 45.) Notably, Plaintiff did not testify to economic reasons for her various failures. Nor does the record reflect such an issue, other than one report that she was not going to therapy because she had no insurance. (R. at 1044.) The ALJ, however, relied on other reports in the record in which Plaintiff did not give a reason for failing to attend therapy. (R. at 584 and 587.)

To be sure, Plaintiff disagrees with the ALJ's conclusion, but that is not sufficient to overturn the ALJ's credibility assessment on this issue. *See VanSingel v. Comm'r of Soc. Sec.*, 26 F. App'x 488, 489 (6th Cir. 2002) ("If supported by substantial evidence, the Commissioner's decision must be affirmed, even if [the reviewing court] would have arrived at a different result.") (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983)); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (concluding that "[a]n administrative decision is not subject to

reversal merely because substantial evidence would have supported an opposite decision.").

**b.    Mercy Memorial Hospital Records**

Plaintiff styles her next argument as one under the treating physician rule, 20 C.F.R. § 416.927, but in substance, it is a continuation of her credibility argument.[5] Specifically, Plaintiff argues that the ALJ failed to consider the treatment records from Mercy Memorial Hospital when disregarding her subjective complaints of

---

[5] Further, the individuals signing the records to which Plaintiff cites are D. Remley, N.P., Kelley Kinsey, R.N., and Abdullahi Mohamed, M.D.  Pursuant to the Social Security Regulations, nurses and nurse practitioners are considered "other sources" upon which the ALJ *may* rely to show the severity of the claimant's impairments and how they affect his or her ability to work, but for whom it is not mandatory to apply the § 404.1527(d) factors.  *See* 20 C.F.R. § 404.1513(d).

The treating physician rule applies to the opinion of Dr. Mohamed, but the documents to which Plaintiff cites do not constitute medical opinions such that the ALJ was required to consider them pursuant to the treating physician rule, 20 C.F.R. § 404.1527, which defines "medical opinions" as follows:

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2).  Here, the treatment notes do not opine on what Plaintiff can do despite her symptoms.  Nor do they address what restrictions might be due to her alleged symptoms.  *See Winter v. Comm'r of Soc. Sec.*, No. 12-11962, 2013 WL 4604782, at *3 (E.D. Mich. Aug. 29, 2013) (concluding that a physician's treatment notes were not medical opinions within the meaning of 20 C.F.R. § 404.1527(a)(2)).  Instead, they are merely office notations addressing Plaintiff's present symptoms at the time of her appointment.

pain.  In doing so, Plaintiff asserts, the ALJ minimized the "waxing and waning" of her mental health symptoms and her limited ability to perform activities of daily living.  (DE 11 at 19.)

### i.  Physical Health

In his opinion, the ALJ considered Plaintiff's self-reported activities of daily living and concluded that they demonstrated greater ability to sit, stand, walk, focus, concentrate, and interact socially than what she had alleged.  (R. at 45.)  He pointed to Plaintiff's testimony that she takes care of her two children and noted that such caregiving "can be quite demanding both physical [sic] and emotionally." (Id.)  He also pointed to the various sports, travel and child care activities listed above.  (R. at 44-45.)  Plaintiff does not dispute these activities of daily living, but simply disagrees with the ALJ's inducing from them that she is not disabled.  She further insinuates that the ALJ made "selective citations" to her reported daily activities (DE 11 at 19); however, the thrust of her argument suggests her own preference for simply *overlooking* the most strenuous activities which are reflected in the record.  It is not this Court's role to re-weigh the evidence. *See Mullen*, 800 F.2d at 545 (concluding that "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.").

The ALJ's consideration of Plaintiff's activities of daily living was not in error.  *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001)

(concluding that the ALJ properly determined that the claimant's "subjective complaints were not credible in light of her ability to perform other tasks," including walking around her yard, riding a bicycle, going to church, going on vacation, cooking, vacuuming, and making beds.).  Additionally, as noted above, Plaintiff's activities of daily living are not the ALJ's only rationale for discounting Plaintiff's allegations of work-preclusive limitations.  *See Boley v. Comm'r of Soc. Sec.*, No. 11-cv-15707, 2012 WL 7748910, at *13 (E.D. Mich. Nov. 28, 2012) *report and recommendation adopted*, No. 11-CV-15707, 2013 WL 1090531 (E.D. Mich. Mar. 15, 2013) (concluding that, while "minimal activities of daily living do not, by themselves, show that a claimant can perform the demands of full-time work," such a consideration *in combination with other relevant factors* was proper to discount Plaintiff's credibility.).  For example, the ALJ also pointed to Plaintiff's failure to follow treatment recommendations (as discussed above), as well as numerous objective tests that revealed fairly normal results.  (R. at 41-44.)

### ii.   Mental Health

Plaintiff also argues that the ALJ improperly characterized her mental health issues as situational.  In support of her position, she emphasizes her treatment records from Mercy Memorial Hospital.  (R at 966-987 and 1041-1056.)  However, a review of those records demonstrates that the ALJ's conclusion was supported by substantial evidence. For example, the reports demonstrate that Plaintiff's anxiety

increased when she felt overwhelmed by financial issues (R. at 974 and 978), that

her anxiety was better controlled during certain points in her treatment (R. at 976

and 1046), that she did not cut or burn herself since learning she was pregnant (R.

at 973), and that her anxiety increased as her stressors did (R. at 1045.)  The ALJ

further noted that Plaintiff "attributed a great deal of her [mental health] problems

to losing custody of her son and being non-compliant with her medications, as her

boyfriend was taking them."  (R. at 43.)  These are all legitimate considerations,

and even if this Court would draw different conclusions from them, it may not

reverse the administrative decision merely because evidence in the record would

have supported an opposite decision.  *See Mullen*, 800 F.2d at 545.

## 2.    Consideration of Plaintiff's Back Impairment

### a.    The ALJ's Step 2 Analysis

Plaintiff contends that the ALJ erred by failing to characterize her L4-5 disc

herniation as severe at Step 2 in his analysis.  Under the Social Security

Regulations, an impairment is "severe" when it "significantly limits an individual's

physical or mental abilities to do basic work activities; an impairment(s) that is

'not severe' must be a slight abnormality (or a combination of slight abnormalities)

that has no more than a minimal effect on the ability to do basic work activities."

S.S.R. 96-3p, 1996 WL 374181 (S.S.A. July 2, 1996).  Here, the ALJ concluded at

Step 2 that Plaintiff's status post-back surgery back pain was severe, but did not

explicitly mention her L4-5 disc herniation.  (R. at 36-37.)  However, the ALJ *did* consider several of Plaintiff's impairments to be severe at Step 2, thereby causing him to consider both her severe and non-severe impairments in the remaining steps of the sequential analysis.  *See Anthony v. Astru*, 266 F. App'x 451, 457 (6th Cir. 2008) (concluding that the "fact that some of [the plaintiff's] impairments were not deemed severe at step two" was "legally irrelevant" because the ALJ considered the entirety of the impairments throughout the decision) (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)) (the failure to find an impairment severe at Step 2 is harmless where other impairments were deemed severe).  Accordingly, the ALJ has only erred in this respect if he has failed to consider all of Plaintiff's impairments, severe and non-severe, throughout the rest of his opinion.

### b.    The Remaining Steps of the Sequential Analysis

I conclude that the ALJ considered all of Plaintiff's impairments, severe and non-severe, throughout the sequential analysis—and especially between Steps 3 and 4—when he determined Plaintiff's RFC.  As support for his RFC, the ALJ noted that Plaintiff underwent a bilateral L4-5 laminotomy surgery for disc excision and nerve decompression in April 2011, which was relatively successful in alleviating her symptoms.  (R. at 41 and 996.)  Following the surgery, the ALJ pointed to relatively benign examinations, normal gait, and normal strength and

tone.  (R. at 506, 509, 512, 515, 713, 716, 761-770.)  He also noted Tanvir

Qureshi, M.D.'s January 2014 examination notes that Plaintiff displayed a "slight

ataxic, lurching gait and diminished range of motion in the lumbar spine," but also

a "normal range of motion throughout the rest of the musculoskeletal system."  (R.

at 41, 953-965.)  The ALJ considered a November 2011 MRI of Plaintiff's lumbar

spine demonstrating a "new large left paracentral disc extrusion at L4-5 with

superior migration extending along the entire height of the L4 vertebral body."

(R. at 41, 1027-28, and 1036-37.)  However, he ultimately concluded that

Plaintiff's fairly robust activities of daily living, such as doing laundry, dishes,

cooking, sweeping, helping to coach her son's baseball team, performing pool

exercises and work out videos, suggested "a greater exertional ability than what the

claimant alleged" *in spite of* the November 2011 MRI. (R. at 41.)

Plaintiff does not dispute that the ALJ considered these records when

assessing the impact of her L4-5 herniation on her ability to work.  Instead, in a

somewhat cursory manner, she asserts that the ALJ should have found her L4-5

herniation to be a severe impairment and considered her ataxic gait, her pain

complaints, and her limited range of motion to determine her RFC.[6]  However, as

---

[6] Plaintiff also makes a cursory mention that the ALJ "never discusses whether the [November 2011] MRI findings alone would meet Listing 1.04," but does not develop the Listing argument any further.  To the extent Plaintiff attempts to make such an argument, I find that it has been waived. The Sixth Circuit has explained that "[i]t is not sufficient for a party to mention a possible argument in a most

noted above, the ALJ *did* consider all of these issues when assessing her RFC. For example, to account for Plaintiff's "consistent complaints of an inability to stand for prolonged periods of time due to severe pain as a result of her back condition," the ALJ included the need for her to sit or stand alternatively, at will, in his RFC. (DE 11 at 25, R. at 39.) Plaintiff does not demonstrate that she is more limited by her L4-5 herniation than what the ALJ opined in his RFC. Accordingly, she has demonstrated no error in this respect.

### 3.   Plaintiff's RFC

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments."   *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§ 404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"   *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to S.S.R. 96-8p, the RFC assessment must include:

---

skeletal way, leaving the court to . . . put flesh on its bones."  *McPhereson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7.

Plaintiff makes three arguments with respect to her RFC. First, she asserts that the ALJ's RFC assessment is not supported by substantial evidence because he rejects the RFC assessments from both consultative examiners. Second, she contends that the ALJ failed to provide a "function-by-function assessment" based on all relevant evidence of her ability to do work-related activities. (DE 11 at 28-29.) Finally, she posits that the ALJ failed to properly assess her mental RFC. I will consider each argument in turn.

### a.    Consultative Examiners

Plaintiff underwent two consultative examinations: a physical examination with Tanvir Qureshi, M.D., and a psychiatric examination by Gayle Oliver-Brannon, Ph.D., L.P. At the January 14, 2014 examination, Dr. Qureshi assessed

that Plaintiff was limited to occasionally lifting up to ten pounds, sitting for five hours, standing for two hours, and walking for one hour in an eight-hour workday. (R. at 960-61.)  He further limited Plaintiff to occasional reaching, handling, fingering, feeling, and pushing/pulling.  (R. at 962.)  He noted that she should never climb ladders or scaffolds or crawl, and could only tolerate exposure to environmental limitations occasionally.   (R. at 963-64.)

The ALJ accorded great weight to the portions of the opinion regarding Plaintiff's need to switch positions, use foot controls, perform postural activities, and placed "an environmental limitation to avoid all exposure to hazards."  (R. at 42.)  As such, he concluded that Plaintiff could work only at the light exertional level, with a limitation that she be able to change positions frequently.  He also adopted Dr. Qureshi's opinion that she could not climb ladders, ropes, or scaffolds and that she should "avoid concentrated exposure to irritants [examples omitted]," to account for her history of asthma and arthritis.  (Id.)

The ALJ discounted Dr. Qureshi's opinion that Plaintiff could lift no more than ten pounds occasionally and was limited to sitting for five hours, standing for two hours, and walking for one hour in an eight-hour day.  He reasoned that such restrictions seemed "severe," given consistent examinations revealing no neurological deficits along with normal strength in the extremities.  He also found this limitation inconsistent with Plaintiff's reported activities of daily living.  These

reasons are sufficient to discount opinion evidence. *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) (concluding that the ALJ properly rejected a treating physician opinion that was not supported by objective medical evidence); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (the ALJ is "not bound by conclusory statements of doctor, particularly where they are unsupported by detailed objective criteria and documentation.") (internal quotation omitted); *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (an ALJ's finding that a medical opinion conflicts with other evidence in the record is sufficient to discount the opinion.).

Plaintiff posits that this conclusion was in error because of her November 2011 MRI showing nerve root compression, as well as her limited range of motion and complaints of pain.  However, as noted above, the existence of evidence in the record supporting an opposite conclusion is not enough for a reversal by this Court. *See Mullen*, 800 F.2d 545.

Plaintiff underwent a psychiatric consultative examination with Dr. Oliver-Brannon on October 14, 2012.  (R. at 946-951.)  Dr. Oliver-Brannon ultimately concluded that Plaintiff had a "history of mood, and psychiatric issues and physical problems that has prevented her from participating in successful long-term employment," but noted that she was appropriate in brief encounters and able to understand and engage in moderate daily living tasks.  (R. at 949.)  The ALJ noted

that this opinion was considered, but "less than persuasive" because it was based entirely on Plaintiff's own self reports and not Dr. Brannon's observation upon examination. (R. at 43.) As noted above, the ALJ had already properly found Plaintiff's subjective reports to be less than credible. This is a valid reason for discounting the opinion of a consultative examiner. *See Morin v. Comm'r of Soc. Sec.*, No. 10-13040, 2012 WL 1004787, at *2 (E.D. Mich. Mar. 26, 2012) (finding that the ALJ's decision to discount the opinion of a treating physician was supported by substantial evidence where it was "based heavily on the subjective reports" of the plaintiff); *Ditz v. Comm'r of Soc. Sec.*, No. 08-11547, 2009 WL 440641, at *13 (E.D. Mich. Feb. 20, 2009) ("[T]he ALJ is permitted to discount any such treating physician opinion if it is based on claimant's subjective reports and the ALJ has sufficient reasons to discount the claimant's credibility.").

To the extent Plaintiff argues that the "RFC Assessment is a medical assessment [that] the ALJ is not qualified to perform," that assertion is unavailing. Instead, the RFC is an issue *reserved* to the ALJ to make. 20 C.F.R. §§ 404.1527(3), 416.927(e). To be sure, ALJs may not "play doctor" or make their own independent medical findings, but there is no indication that the ALJ did so in this case. Instead, he based his ultimate RFC conclusion on the opinions of Drs. Qureshi and Oliver-Brannon, grounded upon the objective medical evidence contained in the record, as well as Plaintiff's reported activities of daily living.

Notably, the ALJ also clearly stated his reasons for each component of the RFC in his analysis. For example, he based the limitation that Plaintiff be able to sit or stand at will on the opinions of the State Agency medical consultant and Dr. Qureshi that she would frequently need to change positions. (R. at 42.) In sum, the ALJ did not err in his treatment of the consultative examiners' opinions, or in assessing the resulting RFC.

### b.      Function-by-Function Assessment

Plaintiff argues that the ALJ erred by failing to "specifically address each functional ability as required by SSR 96-p." (DE 11 at 30.) Plaintiff's argument on this issue misinterprets the dictates of the ruling. "'Although a function-by-function analysis is desirable, S.S.R. 96-8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (quoting *Bencivengo v. Comm'r of Soc.Sec.*, 251 F. 3d 153 (table) (3d Cir. Dec. 19, 2000)). Here, although the ALJ did not explicitly consider each of her functional limitations and their potential impact on her ability to do work, his analysis contains a careful and thorough examination of the entire record, and, as Defendant correctly points out, "was explicit in his consideration of her functional limitations." (DE 12 at 9, citing R. 41-42.) The ALJ did not err in this regard.

### c.      Mental RFC

Finally, Plaintiff asserts that the ALJ failed to properly assess her mental RFC pursuant to S.S.R. 96-8p and S.S.R. 85-15.  Pursuant to S.S.R. 96-8p, the ALJ must "express[] in terms of work-related functions," a claimant's limitations resulting from mental impairments.  When assessing the impact of mental impairments on a claimant's RFC, the "basic mental demands of competitive . . . work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  S.S.R. 85-15.

As noted above, the regulations do not require the ALJ to conduct a function-by-function assessment of a claimant's impairments.  However, Plaintiff once again asserts that the ALJ erred by failing to "specifically, and individually outline, the medical documentation supporting Plaintiff's ability to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting."  (DE 11 at 32.)  Such a function-by-function assessment is not required and therefore the ALJ did not err in this respect.

31

Instead, the ALJ's mental RFC need only be supported by substantial evidence.  I conclude that it was. Specifically, the ALJ limited Plaintiff to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements that involve work-related decisions with few, if any, work place changes and only occasional interactions with the general public, coworkers, and supervisors.  (R. at 44.)  He based these limitations on the opinion of the State Agency psychological consultant, who opined that Plaintiff was capable of performing simple, unskilled work-related activities with sustainability and could adapt to simple routine changes with limited contact with supervisors, co-workers, and the public.  (R. at 147.)  The ALJ also found support for these limitations in Plaintiff's treatment history, which revealed "intermittent periods of exacerbation in the claimant's symptoms when dealing with significant stressors," but otherwise a relatively stable mood with normal speech and rational thoughts.  (R. at 44, 537-38, 564, 922, 978.)  Plaintiff has not demonstrated that she is more limited mentally than the ALJ accounted for in his RFC.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for

summary judgment, **GRANT** Defendant's motion for summary judgment, and

**AFFIRM** the Commissioner of Social Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 22, 2016        s/Anthony P. Patti
                                   Anthony P. Patti
                                   UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing motion was sent to parties of record on July 22, 2016, electronically and/or by U.S. Mail.

                                   s/Michael Williams
                                   Case Manager for the
                                   Honorable Anthony P. Patti